SIDLEY AUSTIN LLP
JEFFREY M. OLSON (SBN 104074) *jolson@sidley.com*
PAUL H. MEIER (SBN 115999) *pmeier@sidley.com*
SAMUEL N. TIU (SBN 216291) *stiu@sidley.com*
MATTHEW S. JORGENSON (SBN 229131) *mjorgenson@sidley.com*
555 W. Fifth Street, Suite 4000
Los Angeles, California 90013
(213) 896-6000 phone
(213) 896-6600 fax

Attorneys for Plaintiff
SYNTHES USA, LLC (f/k/a SYNTHES (U.S.A.))

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| SYNTHES USA, LLC (f/k/a SYNTHES (U.S.A.)),<br><br>                    Plaintiff,<br><br>          v.<br><br>SPINAL KINETICS, INC.,<br><br>                    Defendant. | Case No. C-09-01201-RMW (HRL)<br><br>**SYNTHES' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(b) AND FOR NEW TRIAL AS TO WRITTEN DESCRIPTION**<br><br>Hearing Date:    July 13, 2012<br>Hearing Time:    9:00 a.m.<br>Judge:    Hon. Ronald M. Whyte<br>Courtroom:    6 |

# TABLE OF CONTENTS

Page

I.      NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT ...................................1

II.     INTRODUCTION ....................................................................................................................1

III.    DISCUSSION .........................................................................................................................3

        A.      Legal Standards................................................................................................... 3

                1.      JMOL and a new trial ............................................................................. 3

                2.      The written description defense ............................................................ 3

        B.      The Asserted Claims .......................................................................................... 4

        C.      The "Plurality of Openings" Claim Limitation................................................. 5

                1.      The Court rejected Spinal Kinetics' proposal to limit Claim 29 to a
                        preferred embodiment that the "grooves radially penetrate into the
                        lateral surface of the cover plate" ....................................................... 5

                2.      The '270 patent does not suggest that the inventors considered
                        "grooves that radially penetrate into the lateral surface of the cover
                        plate" an essential element of the invention ....................................... 6

                3.      In the predictable mechanical arts, as here, the written description for a
                        genus may be provided by the disclosure of even a single species ................ 7

                4.      Spinal Kinetics failed to present substantial clear and convincing
                        evidence to support the jury's invalidity verdict for lack of adequate
                        written description ................................................................................. 9

                5.      Dr. Lee's trial testimony had never been disclosed and was adduced
                        through improper tactics ...................................................................... 16

        D.      The "Wherein The Core Is Substantially Cylindrical" Claim Limitation.................. 18

        E.      The "Flexible Core" Claim Limitation .................................................................... 21

        F.      The "Substantially Rigid Bone Contacting Plate" Claim Limitation ........................ 22

IV.     CONCLUSION.......................................................................................................................23

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

Amgen Inc. v. Hoechst Marion Roussel
   314 F.3d 1313 (Fed. Cir. 2003)..................................................................7

5

6

Bilstad v. Wakalopulos
   386 F.3d 1116 (Fed. Cir. 2004)...............................................................7, 8

7

Callicrate v. Wadsworth Mfg.
   427 F.3d 1361 (Fed. Cir. 2005)..................................................................3

8

9

Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.
   635 F.3d 1373 (Fed. Cir. 2011)...................................................3, 4, 6, 12

10

Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.
   93 F.3d 1572 (Fed. Cir. 1996)..................................................7, 8, 13, 14

11

12

Gentry Gallery, Inc. v. Berkline Corp.
   134 F.3d 1473 (Fed. Cir. 1998)..................................................................7

13

Gillette v. Delmore
   979 F.2d 1342 (9th Cir. 1992) ....................................................................3

14

15

Go Med. Indus. Pty, LTD. v. Inmed Corp.
   471 F.3d 1264 (Fed. Cir. 2006)................................................................22

16

In re Heinle
   342 F.2d 1001 (C.C.P.A. 1965) ................................................................22

17

18

In re Rasmussen
   650 F.2d 1212 (C.C.P.A. 1981) .............................................................8, 13

19

In re Vickers
   141 F.2d 522 (C.C.P.A. 1944) ...............................................................8, 14

20

21

Inline Connection Corp. v. Earthlink, Inc.
   684 F. Supp. 2d 496 (D. Del. 2010)..........................................................10

22

Johnson Worldwide Assocs. v. Zebco Corp.
   175 F.3d 985 (Fed. Cir. 1999)....................................................................7

23

24

Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC
   381 F.3d 1142 .............................................................................19, 20, 22

25

Microsoft Corp. v. i4i Ltd. Partnership et al.
   131 S.Ct. 2238, 180 L.Ed.2d 131 (2011) ...................................................3

26

Moba v. Diamond Automation
   325 F.3d 1306 (Fed. Cir. 2003)........................................................3, 7, 10

27

Pavao v. Pagay
   307 F.3d 915 (9th Cir. 2002) .......................................................................3

28

Texas Instruments, Inc. v. ITC
    805 F.2d 1558 (Fed. Cir. 1986)..................................................................................8

Trading Techs. Int'l, Inc. v. eSpeed, Inc.
    595 F.3d 1340 (Fed. Cir. 2010).................................................................................8

Tronzo v. Biomet, Inc.
    156 F.3d 1154 (Fed. Cir. 1998).................................................................................7

United States v. 4.0 Acres of Land
    175 F.3d 1133 (9th Cir. 1999) ..................................................................................3

Vas-Cath Inc. v. Mahurkar
    935 F.2d 1555 (Fed. Cir. 1991).........................................................................22, 23

Volterra Semiconductor Corp. v. Primarion, Inc.
    2011 U.S. Dist. LEXIS 65735 (N.D. Cal. June 21, 2011) ........................................10

Wordtech Sys. v. Integrated Networks Solutions, Inc.
    609 F.3d 1308 (Fed. Cir. 2010).................................................................................3

Yingbin-Nature (Guangdong) Wood Indus. Co. v. ITC
    535 F.3d 1322 (Fed. Cir. 2008)......................................................................... passim

**STATUTES**

35 U.S.C. § 112.............................................................................................8, 9, 14, 22

I.    **NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT**

PLEASE TAKE NOTICE that on July 13, 2012, Synthes USA, LLC will move and hereby moves for Judgment as a Matter of Law and in the alternative, for a New Trial, as to Spinal Kinetics' written description defense.  This motion is based on this Notice of Motion, Memorandum of Points and Authorities, and the Declaration of Jeffrey M. Olson in Support of Plaintiff's Post Verdict Motions ("Olson Decl.") and exhibits thereto.

Synthes herein respectfully seeks a determination of the following issues:

1.    Should JMOL be granted in favor of Synthes on each and every one of the four written description defenses where Spinal Kinetics failed to present competent, substantial evidence to support any one of those defenses; and

2.    In the alternative, as to any written description defense for which a JMOL is not granted, should a new trial be granted in favor of Synthes on that written description defense.

II.    **INTRODUCTION**

Throughout this litigation, Spinal Kinetics has struggled to identify a single meritorious written description defense.  Although it was successful in securing a jury verdict in its favor, Spinal Kinetics failed to adduce substantial clear and convincing evidence to uphold that verdict.

Once one looks behind Spinal Kinetics' legally insufficient observation that there are differences between some of the words used in Claim 29 and the words used in the '270 patent specification, its written description defense is based largely on the conclusory arguments of its experts or counsel and not the required clear and convincing evidence.  While this defense shifted substantially prior to trial, and most significantly when the Court struck the Thomas Smegal "expert" reports (Dkt. 298 at 10-11), Spinal Kinetics settled on four arguments only when it filed its opposition to Synthes' motion for summary judgment.  Dkt. 248.  The four written description defenses, each being independent and distinct from the others, pertain to the claim limitations: (1) "plurality of openings," (2) "wherein the core is substantially cylindrical," (3) "flexible core," and (4) "substantially rigid bone contacting plate."  Id., see Tr. at 2690-91 (Spinal Kinetics' counsel identifying the same four claim limitations).

At the time of its summary judgment opposition, and well after the date for the completion of the expert reports and the expert depositions, Spinal Kinetics first submitted the declaration of Dr. Levenston, who attempted to support three of the four written description defenses, although only in the most conclusory form.  Dkt. 252.  Conspicuously missing from Dr. Levenston's declaration was any support for the written description defense as to the "plurality of openings" claim limitation.  In its opinion denying Synthes' summary judgment motion as to all four of the defenses, the Court explained that there were "material issues of disputed fact," although it did not identify any expert testimony from Spinal Kinetics.  Dkt. 298 at 18-20.  At trial, Spinal Kinetics' evidence as to these three Dr. Levenston-supported written description defenses was either conclusory or non-existent, as explained hereinafter, and falls far short of Spinal Kinetics' clear and convincing burden.

As to the "plurality of openings" claim limitation, Dr. Lee was Spinal Kinetics' trial witness, and his testimony also fell far short of carrying Spinal Kinetics' clear and convincing evidence burden.  Dr. Lee sought to establish that the species of "grooves," which was a opening shape disclosed in the specification, did not provide written description support for the claimed genus of "openings."  However, to support a written description defense on a species/genus distinction, the testimony must both: (1) pertain to a material limitation of the asserted claim and (2) demonstrate the "unpredictability" of the genus in view of what was disclosed in the specification as appropriately interpreted by one skilled in the art.  Dr. Lee's trial testimony failed on both points.  This testimony, which had never been the subject of any pre-trial disclosure, was merely that the '270 patent disclosed a shape of opening wherein the fiber strands were located further from the central axis of the cover plates when compared to Spinal Kinetics' M6 devices, and which would result in the fibers being stressed differently.  Not only was this purported difference immaterial to Claim 29, it was also an absurd argument, being erroneous both as to the law and the facts.  As to the law, the proper comparison is between the teachings of the specification and the asserted claim.  As to the facts, whether the shape of the opening was a groove or a slot does not determine how far the fibers would be from the central axis of the implant.

Thus, Synthes respectfully submits that JMOL as to each of the four written description defenses should be granted in its favor because Spinal Kinetics did not present substantial, clear and

convincing evidence.  Alternatively, as to any written description defense for which a JMOL is not granted, a new trial should be ordered, but only as to that defense.

### III.    DISCUSSION

**A.    Legal Standards**

**1.    JMOL and a new trial**

Post-trial motions for JMOL and a new trial are governed by regional circuit law.  Wordtech Sys. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1313 (Fed. Cir. 2010).

In the Ninth Circuit, a JMOL is proper where "the evidence, construed in the light most favorable to the non-moving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's." Callicrate v. Wadsworth Mfg., 427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir. 2002)).  To withstand a JMOL, a jury verdict must be "supported by substantial evidence," which is "that relevant evidence that a reasonable mind would accept as adequate to support a conclusion."  Id. (citing Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992)).

As for a new trial, it may be granted, "even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" Wordtech, 609 F.3d at 1313 (citing United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999)).

**2.    The written description defense**

Spinal Kinetics bears the burden of showing a lack of written description by clear and convincing evidence.  Moba v. Diamond Automation, 325 F.3d 1306, 1319 (Fed. Cir. 2003); see also Microsoft Corp. v. i4i Ltd. Partnership et al., 131 S.Ct. 2238, 2242, 180 L.Ed.2d 131 (2011) (a challenger that attacks the validity of patent claims has a statutory burden to prove invalidity by clear and convincing evidence.); Dkt. 496 (Jury Instructions) at 15-16.

The test for sufficiency of a written description is "whether the disclosure clearly allows persons of ordinary skill in the art to recognize that the inventor invented what is claimed."  Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp., 635 F.3d 1373, 1380 (Fed. Cir. 2011)

1   (citations and internal quotations omitted).  "The disclosure must reasonably convey to those skilled

2   in the art that the inventor had possession of the claimed subject matter as of the filing date."  Id.

3   (citations and internal quotations omitted).   "Possession means possession as shown in the

4   disclosure, and requires an objective inquiry into the four corners of the specification from the

5   perspective of a person of ordinary skill in the art."  Id. (citations and internal quotations omitted).

6   But, "possession" does not mean that the specification must provide *in haec verba* support for the

7   claim language.  Yingbin-Nature (Guangdong) Wood Indus. Co. v. ITC, 535 F.3d 1322, 1334 (Fed.

8   Cir. 2008).  And, because the "perspective of a person of ordinary skill in the art" is required (Crown

9   Packaging, 635 F.3d at 1380), a conclusion that a claim lacks written description support requires

10  competent expert testimony.

**B.    The Asserted Claims**

12      Synthes asserted three claims of the '270 patent against Spinal Kinetics.  The claims are set

13  forth below, with those claim limitations that pertain to Spinal Kinetics' four written description

14  defenses in bold.

15      29.    An intervertebral implant for implantation between an upper and lower vertebrae, the

16  implant having a central axis, the implant comprising:

17      a first **substantially rigid bone contacting plate** having an external surface extending

18  generally transversely to the central axis for contacting at least a portion of the upper vertebra;

19      a second **substantially rigid bone contacting plate** having an external surface extending

20  generally transversely to the central axis for contacting at least a portion of the lower vertebra;

21      a third plate operatively coupled to the first bone contacting plate, the third plate including a

22  **plurality of openings**;

23      a fourth plate operatively coupled to the second bone contacting plate, the fourth plate

24  including a **plurality of openings**;

25      a central part substantially located between the third and fourth plates, the central part

26  including a **flexible core** and a fiber system, **wherein the core is substantially cylindrical** and

27  includes a top surface and a bottom surface, the top surface of the core being in contact with the third

28  plate and the bottom surface of the core being in contact with the fourth plate, and wherein the fiber

system at least partially surrounds the core, and is at least partially received within the plurality of openings formed in the third and fourth plates so that the fiber system is joined to the third and fourth plates; and

an elastic sheathing body at least partially surrounding the fiber system and the core, and connected to the third and fourth plates.

30.    The intervertebral implant of claim 29, wherein the first and second bone contacting plates are made from titanium or a titanium alloy

31.    The intervertebral implant of claim 30, wherein the fiber system is constructed of an ultra high molecular weight polyethylene (UHMWPE) material.

## C.    The "Plurality of Openings" Claim Limitation

At the time of the Markman hearing, Spinal Kinetics sought to use the "plurality of openings" limitation as a vehicle to narrow claim 29 to a preferred embodiment.  However, after having failed to convince the Court that this claim limitation should be so narrowed, Spinal Kinetics then attempted at trial to invalidate the '270 patent, by focusing on immaterial differences between the preferred embodiment and the M6 devices.  For the reasons stated hereinafter, as to the "plurality of openings" written description defense, Spinal Kinetics' evidence falls far short of providing the substantial clear and convincing evidence necessary to support the jury verdict.  Therefore, Synthes respectfully submits that a JMOL in its favor is appropriate on this written description defense.  In the alternative, a new trial is appropriate.

### 1.    The Court rejected Spinal Kinetics' proposal to limit Claim 29 to a preferred embodiment that the "grooves radially penetrate into the lateral surface of the cover plate"

Claim 29 of the '270 patent recites "a third [fourth] plate including a plurality of openings," which the Court construed as "a third [fourth] plate including two or more openings to allow the fiber system to be joined or anchored to that plate."  Dkt. 84 at 5-6.[1]  In an effort to generate non-infringement positions, Spinal Kinetics argued during claim construction that "openings" should be restricted to (1) "grooves" and that the grooves must (2) "radially penetrate into the lateral surface of

---

[1] The limitations directed to the third and forth plates of claim 29 are identified as the "cover plates" in the '270 patent specification.

the cover plate."    The Court rejected both arguments, holding that "Spinal Kinetics' proposed construction is too limiting."  Id. at 6.

Specifically, Spinal Kinetics proposed that "plurality of openings" be construed as "a cover plate including more than one groove distributed on the circumference and radially penetrating into the lateral surface of the cover plate."  See Dkt. 84 at 5.  During the claim construction hearing, Spinal Kinetics' counsel further stated that it had no objection to using the word "opening" as a substitute for "groove" in its proposed definition.  Thus, as described by the Court, "Spinal Kinetics made clear at the hearing that the location of  the 'openings' was more of its concern."  Dkt. 84 at 5. However, the Court declined to read into Claim 29 a locational limitation ("radially penetrating into the lateral surface of the cover plate"), in addition to not limiting the claim to a species pertaining to the shape ("groove") of the "openings."

In so doing, the Court noted that "[t]he patent discloses different ways in which the fiber system may be joined or anchored to the cover plate."  Id.  In addition, the Court stated that "[t]he specification indicates that 'the anchoring of the fiber system is possible by various means'" and that "there is no limitation in Claim 29 or disclosure in the specification that restricts the manner in which that may be accomplished."   Id. at 6 (citing '270 patent col. 2:4-5).   Thus, while the specification identifies grooves on the periphery of the cover plates as examples of how the anchoring might be accomplished (e.g., col. 3:23, listing "for example" modes of anchoring, only two of which involve grooves), it also discloses other examples of plate "openings" where "channels are mortised in the external surfaces of the cover plates to accommodate the fibre system" (col. 3:52-54) and still other examples where no grooves or openings are mentioned at all.  Col. 3:35 (fibers may be anchored "by adhering the fiber system on the cover plates" without reference to grooves); col. 2:3-6 (anchoring may be achieved on the opposing inner surfaces of the cover plates).

**2.**     **The '270 patent does not suggest that the inventors considered "grooves that radially penetrate into the lateral surface of the cover plate" an essential element of the invention**

As apparent from the Court's claim construction discussion, the '270 specification makes no statement that the invention is limited to "grooves," or that "openings" radially penetrating into the lateral surface of the third and fourth plates is an essential requirement or the only possible mode of

the invention.  In view of this, the '270 patent inventors were free to draft a claim directed to a genus of "openings" and not be limited to a species requiring "grooves radially penetrating into the lateral surface of the cover plate" without running afoul of the written description requirement.  See, e.g., Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572, 1582 (Fed. Cir. 1996).

The absence of any statements in the '270 patent limiting the invention to the use of "grooves radially penetrating into the lateral surface of the cover plate" also takes this case outside the sphere of the Tronzo and Gallery Gentry cases previously cited by Spinal Kinetics.  Tronzo v. Biomet, Inc., 156 F.3d 1154 (Fed. Cir. 1998); Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473 (Fed. Cir. 1998).  Regarding Tronzo, as the Federal Circuit pointed out in Bilstad v. Wakalopulos, 386 F.3d 1116, 1124 (Fed. Cir. 2004), the Tronzo patent "specifically distinguished the prior art" shapes as inferior and "touted the advantage" of a particular shape, such that a claim genus as to shape was not supported by the written description.  Bilstad, 386 F.3d at 1125.  Similarly, subsequent cases have made clear that the rationale of Gentry Gallery is limited to the situation where the inventor "clearly expressed in the written description that he considered his invention to be limited" to a particular embodiment or the written description makes clear that a particular element is "the only possible mode of the invention or that other methods were outside the stated purpose of the invention." Amgen Inc. v. Hoechst Marion Roussel, 314 F.3d 1313, 1333-34 (Fed. Cir. 2003); see also Moba, 325 F.3d at 1319-21 (distinguishing Gentry Gallery); Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985, 993 (Fed. Cir. 1999) ("Gentry Gallery, then, considers the situation where the patent's disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element of [the inventor's] invention.'").

### 3. In the predictable mechanical arts, as here, the written description for a genus may be provided by the disclosure of even a single species

Spinal Kinetics agrees that "peripheral grooves" are a species of the genus "openings."  See Dkt. 502 at 16-17; see also Tr. at 3233 (Spinal Kinetics' counsel arguing that peripheral grooves are a type of opening).[2]  The law is clear that "disclosure of a species may be sufficient written

---

[2] Additionally, by not asserting a non-infringement position related to the "plurality of openings" claim limitation, Spinal Kinetics effectively conceded that the M6 devices fit within this genus.  See also, Dkt. 470 (Spinal Kinetics' November 9, 2011 non-infringement positions).

1  description support for a later claimed genus including that species." <u>Bilstad</u>, <u>supra</u>, 386 F.3d at

2  1124.  The issue is predictability, for "if the art is unpredictable, then disclosure of more species is

3  necessary to adequately show possession of the entire genus." <u>Id.</u> at 1125.  In this regard, the

4  mechanical arts, as here, differ substantially from the biochemical or chemical arts, with the former

5  most often being predictable and where adequate written description can be based on the disclosure

6  of a single embodiment.  <u>Id.</u> at 1126 (the Federal Circuit describing "the mechanical world" as "a

7  fairly predictable field.").  <u>See also</u>, <u>Ethicon</u>, <u>supra</u>, 93 F.3d at 1582, n.7 (citing <u>In re Vickers</u>, 141

8  F.2d 522, 525 (C.C.P.A. 1944) ("As a general rule an applicant in a mechanical case seldom shows

9  more than one embodiment.")); <u>In re Rasmussen</u>, 650 F.2d 1212, 1214 (C.C.P.A. 1981) (disclosure

10  of a single method was sufficient to support a generic claim).

11      When deciding the question of predictability, the knowledge of one skilled in the art must be

12  taken into account.  <u>Bilstad</u>, <u>supra</u>, 386 F.3d at 1126 (finding of a lack of written description vacated

13  and remanded; error to fail to "consider the knowledge of one skilled in the art and the level of

14  predictability in the field"); <u>see also</u>, <u>Trading Techs. Int'l, Inc. v. eSpeed, Inc.</u>, 595 F.3d 1340, 1360-

15  1361 (Fed. Cir. 2010) ("Considering the undisputed knowledge of those skilled in the art, disclosure

16  of a species in this case provides sufficient written description support for a later filed claim directed

17  to a very similar and understandable genus.").

18      "A patent claim is not necessarily invalid for lack of written description just because it is

19  broader than the specific examples disclosed." <u>Martek Biosciences Corp. v. Nutrinova</u>, Inc., 579

20  F.3d 1363, 1371 (Fed. Cir. 2009) (citing <u>Bilstad</u>, 386 F.3d at 1123 ("We cannot agree with the broad

21  proposition … that in every case where the description of the invention in the specification is

22  narrower than that in the claim there has been a failure to fulfill the description requirement in

23  section 112.")); <u>see also</u>, <u>In re Rasmussen</u>, 650 F.2d at 1215 (explaining that, in the context of

24  written description, the fact "that a claim may be broader than the specific embodiment disclosed in

25  a specification is in itself of no moment"); <u>Texas Instruments, Inc. v. ITC</u>, 805 F.2d 1558, 1563

26  (Fed. Cir. 1986) ("This court has cautioned against limiting the claimed invention to preferred

27  embodiments or specific examples in the specification.").

28

1    Yet, Spinal Kinetics improperly told the jury the exact opposite.  Its counsel stated, "if you

2    file a patent application and you only disclose one embodiment, one way of doing things, you are not

3    allowed to then broaden that disclosure in the claim to claim any way of doing things."  Tr. at

4    266:15-20.

5    **4.    Spinal Kinetics failed to present substantial clear and convincing evidence to support the jury's invalidity verdict for lack of adequate written description**

6

7    The "evidence" adduced by Spinal Kinetics regarding "plurality of openings" does not: (1)

8    address the issue of predictability as between "grooves radially penetrating into the lateral surface of

9    the cover plate" and other shapes or types of openings, and (2) does not address what knowledge one

10   skilled in the art would possess to provide a basis for understanding the totality of the '270 patent

11   disclosure.  As such, it is inadequate to carry Spinal Kinetics' high burden of proving a lack of

12   written description by clear and convincing evidence.  Thus, a JMOL in favor of Synthes, or in the

13   alternative a new trial, is appropriate.

14   **a.    Spinal Kinetics ignored the law on written description and instead improperly focused on whether the M6 design was disclosed in the '270 patent specification**

15

16   Dr. Lee was the only Spinal Kinetics witness to address written description relating to the

17   "plurality of openings" claim limitation.[3]  Tr. at 2452-58.  Dr. Lee testified that he could not locate

18   the word "openings" in the '270 patent.  Tr. at 2453:8-11.  Without more, this observation proves

19   nothing because the specification need not provide *in haec verba* support for the claim language.

20   Yingbin-Nature, supra, 535 F.3d at 1334.

21   Thereafter, rather than addressing the legally relevant inquiry, Dr. Lee's testimony focused

22   on a comparison of the '270 patent specification and the M6 devices.  Specifically, Dr. Lee testified

23   that the particular structure found in the M6 device (internal slots) was not identified in the '270

24
_____

25   [3] Previously, Spinal Kinetics cited Mr. Koske's testimony as supporting its written description
     arguments.  Dkt. 502 at 19.  However, any testimony of Mr. Koske as to § 112 issues was excluded
     by the Court as untimely.  Dkt. 298 at 14-16 (Court holding that "[t]here is no justification for Spinal
26   Kinetics to have Mr. Koske's opinions on invalidity submitted in a rebuttal report.").  Thus, Mr.
     Koske could not and did not address the '270 patent disclosure or the claimed invention as construed
27   by the Court.  In this regard, Spinal Kinetics claims to have had no knowledge of the '270 patent
     prior to the filing of this litigation; thus, its design efforts admittedly did not begin with the '270
28   patent disclosure as a starting point.

1   patent (Tr. at 2454:18-2455:15) and that the M6 device had different "biomechanical properties,"

2   because the fiber strands were in a different location relative to the central axis of the third and

3   fourth plates in a preferred embodiment (Tr. at 2457:5-2458:3).

4          This was essentially Spinal Kinetics' rejected claim construction argument, wherein it sought

5   to read a locational requirement into the "plurality of openings" claim limitation, repackaged as a

6   written description defense.  See Dkt 84 at 5-6 (Claim construction Order).  Spinal Kinetics'

7   evidence was woefully insufficient to prove a written description defense.  Rather, it was plainly

8   designed to confuse the jury into returning a written description (or non-infringement) verdict for

9   Spinal Kinetics on the inappropriate basis that the M6 is different from one or more preferred

10  embodiments in the '270 patent specification.

11         The Federal Circuit and other courts have recognized the impropriety of making what is

12  essentially a non-infringement argument, comparing the accused product to the specification, in the

13  "cloak of a validity challenge."  Moba, supra, 325 F.3d at 1321 (affirming verdict rejecting written

14  description challenge based on the absence of a limitation that the court had refused to read into the

15  claim during claim construction); Volterra Semiconductor Corp. v. Primarion, Inc., 2011 U.S. Dist.

16  LEXIS 65735, *16-18 (N.D. Cal. June 21, 2011) (citing Moba, and granting JMOL in favor of

17  patentee on written description defense, where most of the evidence proffered by defendant "focused

18  on whether the specification [] disclosed the accused products rather than the 'claimed invention' as

19  the Court construed the asserted claims"); Inline Connection Corp. v. Earthlink, Inc., 684 F. Supp.

20  2d 496, 531, 534-535 (D. Del. 2010) (citing Moba, and granting JMOL in favor of patentee where

21  the focus of defendants' written description evidence was on non-disclosure of the accused

22  technology instead of whether the inventors were in possession of the claimed invention).

23              **b.    Dr. Lee's testimony does not address any relevant difference between
24              "grooves" and "slots" and the difference he did address is immaterial to
                the limitations of claim 29**

25         In undertaking his comparison between a '270 patent preferred embodiment and the M6

26  devices, Dr. Lee testified that "open grooves in the periphery of the endplates" of the '270 patent

27  function differently from the "slots in the interior of the endplates" of the M6 device.  Tr. at

28

1    2456:11-20.[4]  This explanation was clearly incorrect because Dr. Lee never addressed any actual

2    differences between grooves on the periphery of the cover plates and internal slots.  Instead, Dr.

3    Lee's only testified that changing the **location** of the fibers relative to the central axis of the implant

4    "could make, and it does make a difference in biomechanical properties" of the M6 devices.  Tr. at

5    2456:11-2458:10.

6        To illustrate his point, Dr. Lee drew two cover plates of approximately the same size, one

7    having the fiber through-point within grooves on the periphery of the cover plates (purportedly "the

8    way the '270 fibers are located" in Fig. 2) and the other one having the through-point within internal

9    slots (as "in the M6" device).  Tr. at 2457:1-23;  2599:19-2600:16.  The distance between the central

10   axis and the innermost part of the groove of the first of the two plates was labeled "D-1," and the

11   distance between the central axis and the innermost part of the internal slot of the other plate was

12   labeled "D-2."  Dr. Lee then stated that the distance between the central axis and the internal slot (D-

13   2) was "much smaller" than D-1, and that this "could make a significant difference" in the

14   biomechanical properties of the M6 device.  Tr. at 2457:19-2458:10.

15

16

17

18

19

20

21

22

23

---

24   [4]  Similarly, Dr. Lee's vague and conclusory testimony that "some" work would "probably" be
25   required to go "from fibers that extend to the outer periphery to fibers that are going through slots"
     (Tr. at 2458:13-20) is not only virtually meaningless because it is not even directed to "grooves
26   radially penetrating into the lateral surface of the cover plate" but is also irrelevant to the
     "predictability" inquiry raised under the case law.  By definition, every different species in a genus is
27   different in some way from every other species in that genus.  Yet, the law is absolutely clear that a
     patentee need not disclose every possible species to support a genus claim.  Thus, merely pointing
28   out that there are differences among species cannot be adequate to support a written description
     defense, including the lack-of-predictability requirement of that defense.

While there is apparently no pictorial record of what was drawn, the figures can be visualized as follows, although improved to compare Figure 2 of the '270 patent to both the M6-C and M6-L devices using Spinal Kinetics' engineering drawings:



Figure 2        M6-L        M6-C

This testimony of Dr. Lee was erroneous because the correct written description analysis requires an objective comparison of the asserted claim against the totality of the patent specification, not a comparison of the accused device against a preferred embodiment of the patent. See Crown Packaging, supra, 635 F.3d at 1380.

Moreover, under cross-examination, Dr. Lee was forced to admit that whether the openings were grooves on the periphery of the cover plates or internal slots, this simple observation did not determine the "location" or the distance of the fibers from the central axis of the device. Thus, Dr. Lee acknowledged that a deeper groove would eliminate any "difference" in the distance between the fibers and the central axis in a plate having grooves as compared to one having internal slots. Tr. at 2601:16-19. In other words, a deeper groove would decrease the distance "D-1," such that it could be equal to or even less than "D-2," depending on how deep the groove is made. Likewise, Dr. Lee also acknowledged that an internal slot located closer to the edge of the plate would also eliminate any such "difference." Tr. at 2601:20-23. In other words, the distance "D-2" could be increased, such that it could be made equal to or even greater than "D-1" depending on how close the innermost point of the slot is located to the periphery of the cover plates. Thus, whether the fibers are received in grooves or slots or any other type of opening does not determine how far they are from the central axis.

Taken to its logical conclusion, Dr. Lee's argument would mean that even a claim reciting "peripheral grooves" would be invalid for lack of written description. Such a claim would include within its scope devices having cover plates of varying sizes and grooves of varying depths, so that the distance from the central axis to the fiber system – and thus according to Dr. Lee, the "biomechanical properties" of the implant – would be subject to wide variation. Indeed, Dr. Lee's reasoning would mean that any implant wherein the distance between the central axis and the fiber strands is different from that shown in the '270 patent is outside the scope of the invention possessed by the inventors. For example, a implant with deeper grooves than those shown in Figure 2 of the '270 patent would be outside the scope of the invention possessed by the inventors, because the distance from the central axis to the innermost part of the groove would be different. As another example, an implant having grooves of exactly the same depth as shown in Figure 2, but having endplates of a different diameter, would also be outside the scope of the invention possessed by the inventors, again because the distance from the central axis to the innermost part of the groove would be different.

However, the explanation for the readily apparent absurdity of the foregoing examples is that nothing in the '270 patent limits the claimed "openings" to grooves of a specific depth, or plates of a specific size, or parts with a specific distance between the innermost part of the groove and the central axis. Moreover, neither the claim nor the specification addresses "biomechanical properties" as a function of the distance of the fiber system from the central axis, or places any ranges or limits on such properties or distances. As discussed above, not all of the examples in the specification even contain grooves. Quite simply, it is immaterial to the invention of claim 29 how far the fiber strands are from the central axis, as long as the construction of the fiber system meets the limitations of Claim 29. See, e.g., In re Rasmussen, supra, 650 F.2d at 1215 (disclosure of one only one example of a method of "adheringly applying" one layer of a tube to another provides written description support for the broader term "adheringly applying"; one skilled in the art reading the specification "would understand that it is unimportant how the layers are adhered."). See also, Ethicon, supra, 93 F.3d 1572.

In <u>Ethicon</u>, the examples in the specification of the patent-in-suit disclosed a "lockout mechanism" for a surgical stapler that was located on the staple cartridge, but Ethicon properly obtained a claim that did not limit the location of the lockout to the cartridge. The Federal Circuit explained why this genus claim was not invalid for lack of written description in view of the species that had been disclosed:

> Claim 1 was properly rejected [during reissue] because it *recited* an element not supported by Fox's [the patentee's] disclosure, i.e., a lockout "on the stapler." It does not follow, however, that Fox's disclosure could not support claims sufficiently broad to read on a lockout off of the cartridge. <u>See</u>, <u>e.g.</u>, <u>In re Vickers</u>, [141 F.2d 522, 525] (C.C.P.A. 1944) ("an applicant . . . is generally allowed claims, when the art permits, *which cover more than the specific embodiment shown.*"). If Fox did not consider the precise location of the lockout to be an element of his invention, he was free to draft claim 24 broadly (within the limits imposed by the prior art) to exclude the lockout's exact location as a limitation of the claimed invention. <u>See</u> 35 U.S.C. § 112 (1994) (allocating to the *inventor* the task of claiming what "*the [inventor]* regards as his invention." (emphasis added)). Such a claim would not be unsupported by the specification even though it would be literally infringed by undisclosed embodiments.

93 F.3d at 1582, n.7 (emphasis in original). That is precisely the situation here. The exact location of the openings is not an element of the invention claimed in the '270 patent. The inventors were free to draft claim 29 as they preferred, and Spinal Kinetics should not be permitted to rewrite the claim to fabricate a written description defense.

### c. <u>Assuming – incorrectly – that the location of the fiber strands relative to the central axis of the cover plate is relevant, Dr. Lee's testimony is not substantial evidence of unpredictability</u>

If it is incorrectly assumed that the *location* of the fiber strands compared to the central axis of the cover plate was an aspect of the claim term "plurality of openings," and further assuming the location of the fiber strands altered the biomechanics of the implant, this says nothing about the lack of *predictability* of those biomechanical changes within the genus of "openings." Rather, an implant meeting all of the other limitations of claim 29 would be similar regardless of whether the innermost fiber strands were moved closer to the central axis of the implant, and this similarity would be entirely predictable to one skilled in the art. And, as far as the shape of the various possible openings of Claim 29, including whether they are open-ended "grooves," closed "internal slots," "trapezoidal," or any other shape, Dr. Lee's testimony did not suggest any lack of "predictability" whatsoever.

1  Neither Dr. Lee (nor Dr. Levenston) offered an opinion that the genus of openings of Claim

2  29 was not supported by the '270 patent disclosure to one of skill in the art because moving the fiber

3  strands towards or away from the central axis might would lead to any unpredictable outcome.  It is

4  entirely predictable that a relatively deeper peripheral groove will result in a relatively smaller

5  distance between the central axis and the fiber system.  It is also entirely predictable that an internal

6  slot with the inner edge located relatively closer to the central axis will also result in a relatively

7  smaller distance.  Finally, that the "stress or strain on the fibers" would change depending on the

8  distance between the fiber strands and the central axis, as noted by Dr. Lee (Tr. at 2457:5 –

9  2458:10), does not show any unpredictability, but in fact demonstrates just the opposite.  Dr. Lee's

10  testimony expresses nothing more than the self-evident point that the greater the fiber distance, the

11  greater the "excursion" the fibers will experience and (again predictably) greater the "stress or

12  strain" on the fibers.

13  Whether the biomechanical properties of the implant might change as the dimensions of the

14  components of the device or the distances between components change – or even as Dr. Lee

15  observed on an entirely unrelated point, if "the core shape and the stiffness is different" (Tr. at

16  2458:8-9) – does not mean that a particular change is ***unpredictable***.  Thus, while Dr. Lee opined

17  that such differences might ***affect*** the biomechanical properties of the device, Dr. Lee never opined

18  that any such difference would give rise to a dissimilar result that would be ***unpredictable*** to one

19  skilled in the art.

20  Significantly, no Spinal Kinetics witness ever addressed the legally relevant question of

21  whether from the teachings of the '270 patent, in its entirety, one skilled in the art would conclude

22  that the inventors were not in possession of the full scope of the "plurality of openings" limitation as

23  that term is used in Claim 29.  Dr. Lee acknowledged that he did not even understand Spinal

24  Kinetics' written description argument (Tr. at 2595:1-20), and this is consistent with his failure to

25  address the relevant legal standards for showing a lack of written description.  This focus by Spinal

26  Kinetics on an irrelevant comparison of the M6 devices to a preferred embodiment of the '270 patent

27  was wholly inadequate, if not completely irrelevant, and cannot amount to substantial clear and

28  convincing evidence supporting the jury's verdict.

**5.**    **Dr. Lee's trial testimony had never been disclosed and was adduced through improper tactics**

For all of the foregoing reasons, a JMOL is appropriate on the "plurality of openings" issue or, in the alternative a new trial. In addition, a entirely separate basis exists, as explained hereinafter, for granting a JMOL or new trial in favor of Synthes.

Dr. Lee's trial testimony came as a complete surprise to Synthes.[5]  Dr. Lee's testimony purporting to demonstrate a different result from changing the distance between the central axis and the fiber strands between the grooves on the periphery of the cover plate disclosed in the '270 patent and the internal slots of the M6 device was not in Dr. Lee's expert report, and had not been disclosed previously by any Spinal Kinetics' witness.

Indeed, based on the fact and expert discovery, Synthes did not understand that Spinal Kinetics was pursing a written description defense relating to "plurality of openings." In June 2011, Synthes filed a summary judgment motion seeking to dismiss the entirety of Spinal Kinetics' written description defense, along with other § 112 and § 101 defenses. Dkt. 225. Synthes did not even mention the "plurality of openings" claim limitation in the written description portion of its motion, because no Spinal Kinetics' expert had addressed it. See Dkt. 270 at 3:3-9 (Synthes' reply and commenting on the lack of any expert "evidence" prior to receiving Spinal Kinetics' opposition).

In response to Synthes' summary judgment motion, Spinal Kinetics submitted a number of untimely expert declarations, from Dr. Levenston, Dr. Lee, Mr. Afzal, and Mr. Reo, which purportedly addressed various of the § 112 and § 101 issues. Dkts. 249, 251, 252 and 253. However, neither Dr. Levenston nor Dr. Lee addressed the written description defense as to the

---

[5]  Indeed, in a trial during which all visual aids were exchanged in advance and nearly all were computer generated, that Dr. Lee **hand-drew** the figures he relied upon to explain this argument suggests either that the argument was devised shortly before he testified or was deliberately withheld so as to ambush Synthes.

1  "plurality of openings" claim limitation, and the declarations of Mr. Afzal and Mr. Reo were

2  excluded.  Dkt. 298 at 16-17 (exclusion Order).[6]

3      In its argument opposing the summary judgment motion, Spinal Kinetics never cited nor

4  relied on any expert report, expert declaration or deposition testimony on the "plurality of openings"

5  claim limitation.  See Dkt. 248 at 9-10.  Rather, Spinal Kinetics' entire position was the attorney

6  argument that (1) "the '270 Patent describes only one embodiment with grooves 18 on the periphery

7  of the cover plates for anchoring the fiber system" and (2) "[t]he term 'openings' was never used in

8  the specification or in the originally filed claims…"  Id.  Therefore, according to Spinal Kinetics, the

9  '270 patent was invalid for lack of written description support for the "plurality of openings" claim

10  limitation.  Id.  Despite the lack of competent evidence to create a genuine issue of material fact, the

11  Court denied Synthes' motion.  Dkt. 298 at 20.  Synthes respectfully submits that this was an error,

12  particularly in the absence of any evidence from Spinal Kinetics directed to predictability or what

13  the '270 patent disclosure reasonably conveyed to those skilled in the art.

14      At trial, when Dr. Lee's testimony approached what initially seemed to be a previously

15  undisclosed "plurality of openings" written description defense, Synthes objected on the basis that

16  the subject matter was not in Dr. Lee's expert report.  Tr. at 2455:16-23.  In response, counsel for

17  Spinal Kinetics pointed out a specific passage in Dr. Lee's expert report that he identified as

18  supporting the testimony that was to come, and based on that representation as to the substance of

19  Dr. Lee's testimony, Synthes withdrew its objection.[7]  Tr. at 2455:24-2456:7.

20

21

22

---

[6] The declaration of Spinal Kinetics' primary technical expert at trial on the written description
23  issues, Dr. Levenston, superficially mentioned the three other written description arguments
presented by Spinal Kinetics at trial: "substantially rigid," "wherein the core is substantially
24  cylindrical," and "flexible core."  Dkt. 252.  Conspicuously absent from the these late-filed
declarations was any opinion from Dr. Levenston supporting a conclusion that claim 29 of the '270
25  patent failed for lack of adequate written description as to the "plurality of openings" claim
26  limitations.

[7] To say that Dr. Lee's expert report is not a model of clarity would be an understatement.  In a three
27  paragraph passage entitled "Grooves v. 'Openings,'" Dr. Lee appears to make arguments potentially
directed to claim construction, anticipation and/or obviousness, and non-infringement, but even that
28  is entirely uncertain.  Olson Decl., Ex. 2 at 15-16.

1    The question pending was: "would changing from grooves in the periphery of the endplates

2  to closed slots in the interior of the endplates result in different biomechanical properties of the

3  device?"  Tr. at 2455:16-20.  Dr. Lee's expert report stated:

4       "A device like that shown in the '270 patent with the fibers anchored in the grooves
        or channels in the endplates will operate differently than a device in which similar
5       fibers are allowed to glide (that is, are not anchored), in interior slots.  I am of the
        opinion that those two devices will exhibit different biomechanical properties."
6

7  Olson Decl., Ex. 2 (Lee Report) at 16.[8]  Thus, this question appeared to be an attempt (although

8  misguided) to support Spinal Kinetics' non-infringement position as to anchoring.

9       However, the answer that Dr. Lee gave at trial about different distances from the central axis

10 (Tr. at 2456:22-2458:10) had ***nothing*** to do with the "anchoring" passage identified by Spinal

11 Kinetics' counsel to induce Synthes into withdrawing its objection.   Such sharp tactics are

12 reprehensible and should not be countenanced by the Court.  This serious misconduct alone justifies

13 the relief sought by Synthes, particularly considering that it was only as a result of this misconduct

14 that Spinal Kinetics was able to get into evidence what ended up being its written description

15 defense as to the "plurality of openings" claim limitation, which had not been the subject of any

16 expert report.

17 **D.    The "Wherein The Core Is Substantially Cylindrical" Claim Limitation**

18      At trial, Dr. Levenston was the only Spinal Kinetics witness to address the written

19 description defense relating to the "wherein the core is substantially cylindrical" claim limitation.

20 Dr. Levenston ignored the description of various shapes identified in the '270 patent specification,

21 including those which Spinal Kinetics' lawyers sought to distinguish from "substantially cylindrical"

22 during its closing argument.   Tr. at 3229:25-3230:11 ("the '270 patent distinguishes between

23 'essentially hollow-cylindrical' and 'barrel-shaped' … if it's barrel-shaped, it's not essentially

24 cylindrical.").   See '270 patent, Col. 3:55-62; see also, Dkt. 84 at 12 (Court's claim construction

25

26

---

27 [8]  The transcript indicates that counsel for Spinal Kinetics referenced page 11 of Dr. Lee's report.
The correct page is 16.  This is either a transcription error, or counsel for Spinal Kinetics misspoke.
28 Nothing on page 11 supports the answer given by Dr. Lee, nor deals with this subject matter
whatsoever.

1   Order recognizing "something that is 'substantially cylindrical' may also be, but is not necessarily

2   required to be, 'barrel-shaped.'").

3       Instead, Dr. Levenston first testified that he did not find the words "substantially cylindrical"

4   in the specification. Tr. at 2379:3-6. This, of course, is insufficient as a matter of law. Yingbin-

5   Nature, supra, 535 F.3d at 1334. The remaining few lines of Dr. Levenston's testimony is the very

6   definition of conclusory, and is exactly the kind of testimony found to be inadequate to support a

7   jury verdict in Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1154-55 (affirming

8   JMOL overturning jury verdict of invalidity based on written description, holding that "the

9   presentation of a conclusory or unsupported expert opinion that a patent specification lacks an

10  adequate written description is insufficient to raise a genuine issue of fact."). The entirety of Dr.

11  Levenston's testimony is found in the accompanying footnote.[9]

12

13

14

15

---

16  [9] Q. Did you find the words "substantially cylindrical" in the '270 patent anywhere other than in claim 29?

    A. No.

17  Q. Were you able to find anything in the '270 patent that describes a, quote-unquote,

18  "substantially cylindrical" core?

19  A. No.

    Q. Is there a commonly understood meaning in the art for, quote, "substantially cylindrical"?

20  A. No.

21  Q. Looking through the '270 specification, did you look for some indication that suggested that

22  the inventors had in mind a substantially cylindrical core in addition to the cylindrical core?

    A. … Yes, I did look.

23  Q. And did you find it?

24  A. No, I did not find it.

    Q. Did you reach an opinion as to whether or not, based upon your review, you were convinced

25  that the inventors had a substantially cylindrical core in mind or not?

26  A. I did reach a conclusion.

    Q. And what was that?

27  A. I could find no evidence that the inventors had a substantially cylindrical core in mind.

28  Tr. at 2379:3-2380:4.

Moreover, in <u>Koito</u>, the expert "ignored" one of the figures that provided written description support. 381 F.3d at 1154-55. Similarly, Dr. Levenston completely ignored the '270 patent figures, which clearly depict cylindrical cores, e.g.:

 

Indeed, Dr. Ducheyne testified in rebuttal that at least figures 4, 5a, 5b, 6a and 6b show cylindrical cores. Tr. at 2906:7-2907:18 (e.g., "for someone with a technical background, that's [Fig 4] very clearly a cylindrical body where the fibers make contact with the core"). Moreover, this testimony could not have come as a surprise to Spinal Kinetics or Dr. Levenston, because Dr. Ducheyne raised this point in his rebuttal report many months before trial. <u>See</u> Dkt. 227-7, Ex. 13 (Ducheyne 5/5/11 Report at 52-53). <u>See also</u>, Dkt. 298 at 19 (Order on pre-trial motions, noting Synthes argument that "Spinal Kinetic's experts fail to address several figures in the '270 patent that depict cores in the shape of a cylinder.").

In view of the '270 patent figures, and Spinal Kinetics' clear knowledge of Synthes' position that those figures provide written description support, Dr. Levenston's bald observation that he could not find any such disclosure – without any explanation of what is disclosed in the specification regarding the geometric shape of the core, including the figures – is plainly conclusory and inadequate. Thus, JMOL, or in the alternative a new trial, is appropriate as to the "wherein the core is substantially cylindrical" claim limitation because the evidence is insufficient to support a jury verdict, particularly in view of Spinal Kinetics' clear and convincing evidence burden.[10]

---

[10] In addition, Dr. Levenston's conclusory opinions at trial are not supported by any analysis offered by way of an expert report or deposition testimony. As pointed out by Synthes when it sought summary judgment, the only Spinal Kinetics' "expert" who submitted a report on the written description issue was Thomas Smegal. <u>See</u> Dkt. 225 at 4. <u>See also</u>, Dkt. 298 at 10-11 (excluding Mr. Smegal's proffered testimony). Rather, to the extent Dr. Levenston had any invalidity opinions
<span style="float:right">*(Footnote continued)*</span>

1    **E.        The "Flexible Core" Claim Limitation**

2          No Spinal Kinetics witness provided testimony to support Spinal Kinetics' written

3    description defense based on "flexible core," and Spinal Kinetics identified no such testimony or

4    other evidence to support this defense in its Opposition to Synthes' pre-verdict JMOL.  Dkt. 502 at

5    23-24.  To the contrary, Dr. Lee conceded that the '270 patent describes a "flexible" core.  Dr. Lee

6    admitted that the '270 patent inventors disclosed the use of an "elastomeric central core," and that

7    the '270 patent discloses in column 1 the deformable core found in Dr. Lee's own '718 patent.  Tr. at

8    2550:2-2551:1.

9          While this should have put an end to this defense, in its closing argument, Spinal Kinetics

10   sought to salvage it by stating that the term "flexible core" does not appear in the specification (Tr.

11   at 3236:8-10), which is legally insufficient (<u>Yingbin-Nature</u>, <u>supra</u>, 535 F.3d at 1334), and by

12   impermissibly presenting a rejected claim construction argument that the only "core" disclosed in

13   the specification is a liquid core.  Tr. at 3236:11-14.

14         In its claim construction Order, the Court held that "[c]laim 29 refers only to a 'flexible

15   core'" and "the only 'core' described is the 'flexible core.'"  Dkt. 84 at 8.  The Court specifically

16   rejected Spinal Kinetics' argument "equating the word 'core' with the composition of the core."  <u>Id.</u>

17   The Court went on to hold that the specification discloses a "flexible core":

18         "**The specification discloses embodiments which have a flexible core** ('an
           elastically deformable body') which contains 'an incompressible core' or center part.
19         The reference to 'core' in the specification merely refers to the center part of a
           particular component of the implant and descriptive language such as 'flexible' or
20         'incompressible' discloses the composition of that particular core.

21              Spinal Kinetics also contends that 'flexible core' cannot be referring to an
           'elastically deformable formed body' such as item 9 in the specification because
22         'elastic' and 'flexible' have different meanings. However, in the context of the patent,
           **it would be clear to one skilled in the art that 'flexible' does describe the 'elastic'**
23         **or 'deformable' nature of the elastic body 9**. This conclusion would be clear from
           the description of how the implant is designed to work. See '270 Pat. 5:14-22 and
24         5:46-53."

25   Dkt. 84 at 9 (emphasis added).

26

27   _____

     regarding the "wherein the core is substantially cylindrical" claim limitation, these opinions solely
28   related to Spinal Kinetics' "indefiniteness" defense.  After losing this issue at summary judgment
     (Dkt. 298), Spinal Kinetics sought to convert it into a written description defense at trial.

Indeed, Synthes pointed out in its summary judgment briefing that Spinal Kinetics had failed to put forward evidence to create an issue of fact, and had submitted untimely expert declarations in a failed effort to fix the situation.  See Dkt. 270 at 2 (also referencing Dkt. 246 at 17-19).  In denying Synthes' summary judgment motion, the Court did not identify any fact or expert witness testimony or other evidence to support Spinal Kinetics' position.  Dkt. 298 at 18:22-19:9.  Spinal Kinetics' complete failure to introduce any evidence at trial confirms that it had no evidence all along, and that summary judgment would have been appropriate.  However, now there is certainly no question that JMOL should be granted as to the "flexible core" claim limitation, or in the alternative a new trial is appropriate.

## F.    The "Substantially Rigid Bone Contacting Plate" Claim Limitation

Once again, not a single Spinal Kinetics witness discussed this claim limitation.  Spinal Kinetics cannot carry its clear and convincing evidence burden by merely pointing out the absence of the phrase "substantially rigid bone contacting plate" in the specification, as it did during closing arguments.  Tr. at 3236:19-21.  This was inadequate.  Yingbin-Nature, supra, 535 F.3d at 1334.

The bone contacting plates of Claim 29 are identified as the "closing plates" in the '270 patent specification.  The specification states "the closing plates 14, 15, arranged externally, are made from titanium or a titanium alloy."  Col 6:4-5.  Closing plates 14 and 15 are shown in Figures 3 and 4 of the '270 patent.  A *titanium plate* having proportions anywhere even close to those shown in the '270 patent figures would be considered a substantially rigid bone contacting plate (see Tr. 1074:16-1075:10), and Spinal Kinetics failed to provide any evidence to suggest that one of skill in the art would conclude otherwise.

While it has been held that "patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes" (Go Med. Indus. Pty, LTD. v. Inmed Corp., 471 F.3d 1264, 1271 (Fed. Cir. 2006)), it is also true that "under proper circumstances, drawings alone may provide a 'written description' of an invention as required by § 112."  Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1565 (Fed. Cir. 1991) (citing In re Heinle, 342 F.2d 1001, 1007 (C.C.P.A. 1965) (claim limitation of "approximately one-fourth of the circumference" is adequately supported by drawing conforming to the limitation "almost exactly")); see also Koito, 381 F.3d at

1154-55 (Figure showing that one structure is "significantly thicker and wider" than another structure provides written description support). And, "[c]onsideration of what the drawings conveyed to persons of ordinary skill is essential." Vas-Cath, 935 F.2d at 1566 (declaration from one skilled in the art regarding what drawings disclose about the ratio of the dimension of one part to another raises triable issue of fact on written description question).

Once again, Synthes pointed out in its summary judgment briefing that Spinal Kinetics had failed to put forward evidence to create an issue of fact, and had submitted untimely expert declarations in an failed effort to do so. See Dkt. 270 at 3 (also referencing Dkt. 246 at 19-21). In denying Synthes' summary judgment motion, the Court again did not identify any fact or expert witness testimony or other evidence to support Spinal Kinetics' position or that would create a genuine dispute of material fact for trial. Dkt. 298 at 19:21-20:7. Spinal Kinetics' complete failure to introduce any evidence at trial confirms that it had no evidence all along, and that summary judgment would have been appropriate. Under these circumstances, there is now certainly no question that JMOL should be granted as to the "substantially rigid bone contacting plate" claim limitation, or a new trial is appropriate.

## IV.   **CONCLUSION**

For the foregoing reasons, and those set forth in its prior briefing (Dkts. 473, 504), Synthes respectfully requests that the Court grant its motion for JMOL as to each of the four written description defenses, as there is no substantial clear and convincing evidence to support the jury's verdict. However, in the event that the Court denies JMOL in Synthes' favor based on any one of the four defenses, Synthes requests a new trial as to the remaining defenses, for all of the reasons stated herein, and because some or all of these defenses should have been taken from the jury before closing arguments.

Respectfully submitted,

SIDLEY AUSTIN LLP


Dated: May 21, 2012                 By:   /s/ Jeffrey M. Olson
                                          Jeffrey M. Olson
                                          Attorneys for Plaintiff
                                          SYNTHES USA, LLC